[Cite as *S.Y. v. A.L.*, 2023-Ohio-3964.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
WOOD COUNTY

S.Y.                                           Court of Appeals No.  WD-22-068

    Appellant                             Trial Court No. 2022 JO 0480

v.

A.L.                                           **DECISION AND JUDGMENT**

    Appellee                              Decided:  October 27, 2023

* * * * *

Brian C. Morrissey, for appellant.

Alex M. Savickas, for appellee.

* * * * *

**MAYLE, J.**

{¶ 1} Appellant, S.Y., appeals the October 3, 2022 judgment of the Wood County

Court of Common Pleas, Juvenile Division, denying his petition for a civil protection

order against appellee, A.L.  For the following reasons, we affirm.

## I. Background and Facts

{¶ 2} In May 2022, S.Y., who was almost 19 years old, filed a petition for a juvenile civil protection order ("CPO") against A.L., who was 14 years old. In his petition, S.Y. alleged that A.L., his ex-girlfriend, was "continually" reaching out to him on social media platforms through follow requests; "[i]n the near past," A.L. and her family members had been "stalking/driving past" his house to try to intimidate him and his family; A.L. had told "multiple people" at her high school that S.Y. had raped her and her younger sister; "in the past[,]" A.L. had "threatened to have her parents cause physical harm * * *" to S.Y. and his property; and A.L. "continued to show up to [his] place of employment." The magistrate who heard S.Y.'s request for an ex parte CPO denied the "specific relief [he] requested at the hearing," but ordered A.L. to have no direct or indirect contact with S.Y.

{¶ 3} In July 2022, the magistrate held a hearing on S.Y.'s request for a CPO. At the hearing, S.Y. presented the testimony of his father and testified in his own behalf. A.L. testified in her own behalf.

{¶ 4} According to S.Y., he and A.L. were in a romantic relationship that soured because her parents did not approve. In October 2021, S.Y. consented to a protection order against him under which A.L. was the protected person. Before that, on August 10, 2021, A.L.'s mother, on A.L.'s behalf, had obtained an ex parte protection order against S.Y. All told, S.Y. had six criminal complaints filed against him in the Bowling Green

2.

Municipal Court relating to his relationship and behavior with A.L. The docket sheets that A.L. submitted as exhibits show that S.Y. was convicted of one charge of unlawful sexual conduct with a minor and three charges of violating a protection order, is on community control until October 2026, and served more than seven months in jail. S.Y. said that he went to jail three separate times for violating the protection order: "the first two times * * * because I responded to a message she sent me, and the third time was because I walked across the street * * * to talk to a neighbor, and that neighbor's house is within 500 feet [of A.L.'s house]."

{¶ 5} After his final conviction in December 2021 (which resulted in a 180-day jail sentence), S.Y. claimed that A.L. contacted him on several occasions. These contacts were all in the form of requests to connect on social media. Specifically, S.Y. claimed that A.L.'s accounts sent him five follow requests on Instagram and added him as a friend twice on Snapchat. She also communicated with him through a shared Google Docs document (which led to his final violating-a-protection-order conviction), both before and after he went to jail in late 2021. Additionally, in September (presumably of 2021), he and A.L. created a Twitter account that they each had access to and could use to communicate.

{¶ 6} S.Y. presented as exhibits screenshots from his phone that, he claimed, showed that A.L. sent him five follow requests on Instagram. The majority of these screenshots did not have a date on them, but S.Y. recalled that he received two in May

3.

2022, one the day he filed the CPO petition and one several days later; one in June 2022; and one in the week before the CPO hearing in July 2022. He could not remember the date he received the final follow request, but said it was also after he filed his CPO petition and the magistrate issued a no-contact order against A.L. The other notifications in the screenshots were different—i.e., the screenshots were not identical, despite each containing a follow request from A.L.'s account—which S.Y. pointed to as evidence that each follow request from A.L.'s Instagram account was a new, unique request. He also claimed that each request was new and unique because he blocks the account and "delete[s] the[ requests] as soon as they come in so they're not on [his] phone so [he] can't accidentally press confirm."

{¶ 7} In addition to the follow requests on Instagram, S.Y. presented screenshots showing that A.L.'s account (with a different username) viewed his Instagram story in November (presumably of 2021). The same exhibit also contains a screenshot of a message that S.Y. received through Instagram from a user named "Emma Tanner." Although S.Y. did not know for sure that A.L. was behind the Emma Tanner account, he believed that she was because their shared Twitter account also included the name "Emma;" the Emma Tanner account was new, had no profile picture, and "blocked [S.Y.] immediately after[;]" and the message said only "[A.L.]'s wife[.]"

{¶ 8} S.Y. also presented two screenshots showing that A.L.'s Snapchat account had added him as a friend, despite S.Y. blocking A.L.'s account. Neither of these

4.

screenshots had a date on them, but each had a different list of "Quick Add" accounts below the notification that A.L.'s account "Added Me." He believed that the Snapchat adds were unique adds because he "blocked her before and then it happened again. So when you block someone, the notification gets removed so you can't see them." S.Y. did not testify to the dates he received the Snapchat notifications.

{¶ 9} S.Y. said that the repeated requests from A.L. had been "stressful" and he had to "make sure [he's] not putting [him]self at risk." He blocked A.L.'s Instagram and Snapchat accounts. He also got a new phone number. He said that he was afraid for his health and safety "because I have an order of protection on me, * * * I've moved. A lot of things have changed in my life. And it just, you know, keeps happening. It's like I cannot really, you know, use my phone or really anything without worrying like, you know, who texted me, who called me, who is this adding me * * *." He also claimed that the requests from A.L. were causing him mental distress, and that he "stopped using social media" so that he would not "accidentally accept" a request from A.L. S.Y. summarized the ways his life was different because he was trying to avoid contact with A.L.:

> [W]here I live. * * * I don't go see my parents anymore because there's been instances where she's been outside our house. I mean, I don't talk to a lot of * * * my old friends at Bowling Green High School because either rumors have been spread about me * * *, it's just risky because I

5.

don't know who's texting * * * me, if it's her using someone else's phone

or if it's the actual person. It's just too risky so I don't do it.

In short, S.Y. said that he "changed a lot in [his] life to avoid * * *" further charges

related to the protection order against him. He wanted a CPO against A.L. so that he

could "just kind of move on and, you know, pick up the remains and just kind of move on

with life."

{¶ 10} On cross, S.Y. said that the existence of the protection order against him

caused him emotional distress, but acknowledged that his conduct was what led to a court

granting the order. He also admitted that he could simply not respond to any requests to

connect on social media. Although S.Y. had filed police reports related to the social

media requests, A.L. had not been criminally charged as a result.

{¶ 11} S.Y. filed the CPO petition about two weeks after he was released from jail

after serving his 2021 sentence. He admitted that he was not in any danger from A.L. for

the six months that he was in jail. About a month before the CPO hearing (and a month

after S.Y. filed his petition), S.Y. also attempted to obtain CPOs against A.L.'s parents.

The domestic relations division of the common pleas court denied those petitions because

S.Y. did not present evidence that either of A.L.'s parents knowingly caused S.Y. mental

distress or caused him to believe that they would cause him physical harm.

{¶ 12} S.Y.'s father testified that he installed a doorbell camera at his house

"[b]ecause [A.L.'s] family was driving past quite a bit, and * * * we wanted video of

6.

them doing that in case we ended up in a place like this." Specifically regarding A.L., father said that someone "was making [] puking noises outside the[ir] window * * * on several occasions[,]" and he thought A.L. was the culprit. To support this testimony, S.Y. played two video clips from father's doorbell camera. Both clips were from the same day in April 2022 (while S.Y. was in jail) and had timestamps that were about 30 minutes apart. Father noted that the clips were from "the day [A.L.] rode by and gave us a nice F bomb [sic] when we were walking our dogs." The videos showed people riding bikes on the street in front of father's house. In one clip, "three youngsters" rode past the house making "puking noise." In the other, "two youths" were riding past the house "[m]aking puking noises." Father did not know who the people in the videos were, and the camera was too far from the street for the people to be identifiable on the video. However, he thought that it was A.L. and her friend, who were "the same ones that almost ran us over on the sidewalk" that day. That was the first and only time that someone made "puking noises" outside of his house.

{¶ 13} In her testimony, A.L. admitted that the social media accounts in S.Y.'s exhibits belonged to her and that her account appeared in the Instagram follow requests. However, she denied adding S.Y. on Snapchat, claiming that she did not know his Snapchat username.

{¶ 14} After the consent protection order was granted, A.L. "blocked [S.Y.] on every social media that [she was] aware of his username on" and had not contacted him

7.

through her social media accounts. She did not recall adding S.Y. as a friend on Snapchat, but said that she had accidentally requested to follow him on Instagram once. She explained that she had blocked S.Y.'s Instagram account, and "just wanted to put [her] mind at ease so [she] * * * unblocked him and reblocked him just to really make sure he was blocked because [she] did not want to accidentally contact him[,]" but she "accidentally hit the request follow button." She said that she immediately canceled the request and blocked his account.

{¶ 15} Although she admitted that "[t]he evidence shows" that she made the request, she could not "remember a time where I have purposely tried to follow him because I have no reason or will to contact him." She could not remember when she sent the accidental request, but said it was "recently." A.L. was sure that she "only accidentally sent one" follow request on Instagram, but was "not sure" how she knew that she only sent one request; she admitted that she could have sent multiple accidental follow requests, but said she did not send the requests on purpose. She also noted that the exhibits from Instagram "show[] nothing about how it's a different request. That could be the same request just left in his inbox."

{¶ 16} Beyond the single Instagram request, A.L. said that she had not tried to contact S.Y. any other times after October of 2021. She denied initiating contact with him through the Google Docs document, contacting him through Facebook Marketplace, creating the "Emma Tanner" Instagram profile that messaged S.Y., knowing how to "get

8.

around" a blocked account on Instagram, and being familiar with or logging into the joint Twitter account S.Y. testified about.

{¶ 17} A.L. admitted to riding past S.Y.'s parents' house making puking noises one time, but was "not sure" if she was in the videos from the doorbell camera because she "cannot tell who that is in that video."

{¶ 18} Following the hearing, the magistrate granted S.Y. a CPO against A.L. The magistrate found that A.L. contacted S.Y. through social media requests on Instagram and Snapchat seven times, including one after the court issued the no-contact order in this case, initiated several other contacts through social media, and admitted to riding past S.Y.'s parents' house making vomiting noises. As a result of A.L.'s behavior, S.Y. changed his phone number, removed social media apps from his phone, moved, is wary of social media requests from unknown accounts, and avoids speaking to old friends because he is concerned about inadvertently violating the consent protection order. Although the magistrate determined pursuant to R.C. 2151.34(C)(2)(a) that S.Y. was "in danger of being or ha[d] been harmed by [A.L.] as defined in R.C. 2903.11, 2903.12, 2903.13, 2903.21, 2903.211, 2903.22, 2911.211, and 2950.01 * * *[,]" she did not specify which of the statutes covered A.L.'s actions.

{¶ 19} A.L. objected to the magistrate's decision because the magistrate did not make a credibility finding regarding S.Y.'s and A.L.'s testimony, should have found

9.

A.L.'s version of the facts more credible, and should have deemed S.Y.'s filing frivolous and awarded attorney fees to A.L.

{¶ 20} In its decision, the trial court found that S.Y. and A.L. were in a relationship that ended, at least in part, because A.L.'s parents did not approve of the relationship.

{¶ 21} A.L. had a protection order against S.Y. since August 10, 2021. From August to December 2021, S.Y. was charged with six misdemeanors (one charge of unlawful sexual conduct with a minor and five counts of violating a protection order), was convicted of the unlawful-sexual-conduct charge and three violating-a-protection-order charges, and served approximately seven months in jail. S.Y.'s final jail sentence ended around May 10, 2022.

{¶ 22} Two weeks after his release, S.Y. filed CPO petitions against A.L.'s parents in the domestic relations division of the common pleas court and against A.L. in the juvenile division. The domestic relations division denied the petitions against A.L.'s parents. Although S.Y. requested an ex parte emergency CPO against A.L., the magistrate denied his request, but issued a no-contact order instead.

{¶ 23} In his petition against A.L., S.Y. claimed that he was "in fear and in continuing danger." At the hearing, S.Y. presented evidence showing that A.L. repeatedly tried to contact or follow him through social media. A.L. denied purposely contacting or following S.Y. S.Y. presented video suggesting that A.L. rode her bike past his parents'

10.

house "making sounds as if a person was vomiting[,]" and A.L. admitted to riding her bike past the parents' house making "puking noises." S.Y. claimed that he was unable to use his phone without worrying and stopped using social media. He was "afraid for his health and safety" and experiencing "mental distress" due to his "fear of violating the existing protection order and returning to jail."

{¶ 24} The court noted that issuing a CPO under R.C. 2151.34(C)(2)(a) requires a finding that the respondent committed conduct defined in R.C. 2903.11, 2903.12, 2903.13, 2903.21, 2903.211, 2903.22, 2911.211, or 2950.01. The court determined that the only statutes potentially applicable in this case were R.C. 2903.21 (aggravated menacing), 2903.211 (menacing by stalking), and 2903.22 (menacing). After reviewing the facts in evidence, the trial court determined, based on the "actual evidence properly before the court," that a preponderance of the evidence did not support a finding that A.L. caused S.Y. or his family to believe that she would cause any of them physical harm or serious physical harm, as required by the menacing and aggravated menacing statutes. The court concluded that "both [A.L.'s] purported social media contact attempts, if believed, as well as [A.L.] riding her bike past the home of [S.Y.'s] parents making an inappropriate noise, simply cannot be construed as the type of activity anticipated by the menacing and aggravated menacing statutes in these circumstances."

{¶ 25} The court went on to determine that "the actual evidence properly before the court" did not support a finding that S.Y. or his family were in danger of being

11.

harmed, as required by the menacing by stalking statute. The court found that there was "insufficient evidence to suggest * * *" that S.Y. suffered "mental distress" as defined in R.C. 2903.211(D)(2). The court specifically concluded that S.Y. "feeling uneasy or worried about having possible direct or indirect contact with [A.L.], and the potential ramifications therefrom, do not rise to the level of 'mental distress' clearly anticipated by the applicable statutes * * *."

{¶ 26} Based on these conclusions, the trial court sustained A.L.'s objections and vacated the magistrate's decision granting the CPO.

{¶ 27} S.Y. now appeals, raising three assignments of error:

I. The trial court erred in granting the objection of Appellee as the trial court misinterpreted the definitions in the Ohio Revised Code.

II. The trial court erred in granting the objections of the Appellee as the Appellee did not meet her burden of proof.

III. The trial court erred in failing to recognize that the protected party abused the purpose of the protection order.

## II. Law and Analysis

{¶ 28} S.Y. argues in his assignments of error that the trial court erred by misapplying the statutory definitions in the menacing-by-stalking statute, went beyond the scope of Civ.R. 65.1(F)(3)(d)(iii) when it sustained A.L.'s objections, and failed to recognize that A.L. "abused" the purpose of a CPO.

12.

{¶ 29} Protection orders against juveniles are authorized by R.C. 2151.34.[1] A petition for a CPO against a juvenile must include an allegation that, as relevant here, the respondent violated R.C. 2903.211 (the menacing-by-stalking statute) and a "description of the nature and extent of the violation[.]" R.C. 2151.34(C)(2)(a).

{¶ 30} To grant a CPO after a full hearing on the petition, the judge or magistrate must find, by a preponderance of the evidence, that the petitioner is in danger of the respondent subjecting him to one of the criminal offenses listed in R.C. 2151.34(C)(2)(a). *J.H. v. S.P.*, 10th Dist. Franklin No. 13AP-70, 2013-Ohio-3833, ¶ 7. Because a CPO is "designed to protect the petitioner from future harm[,]" the petitioner must show that he "is in danger of further abuse." (Emphasis deleted.) *In re E.P.*, 8th Dist. Cuyahoga No. 96602, 2011-Ohio-5829, ¶ 29; *A.D. v. K.S.-S.*, 9th Dist. Lorain No. 20CA011628, 2021-Ohio-633, ¶ 6, citing *Wetterman v. B.C.*, 9th Dist. Medina No. 12CA0021-M, 2013-Ohio-57, ¶ 13; *E.P.* at ¶ 28; and *Felton v. Felton*, 79 Ohio St.3d 34, 679 N.E.2d 672 (1997), paragraph two of the syllabus. Although past incidents are relevant to determining whether the petitioner fears future harm, "a juvenile protection order [should] not issue based on evidence of a past incident without evidence that the [petitioner] presently fears future harm." *A.D.* at ¶ 7.

---

[1] A prior version of the statute was in effect when S.Y. filed his petition, but the current version is the same in all respects that are material to this case.

13.

{¶ 31} Under Civ.R. 65.1, a trial court can refer a CPO petition filed under R.C. 2151.34 to a magistrate. Civ.R. 65.1(A), (F)(1). When a party files objections to the magistrate's order granting or denying the CPO, that party has the affirmative burden of showing that (1) "an error of law or other defect is evident on the face of the order, * * *" (2) "the credible evidence of record is insufficient to support * * *" granting or denying the CPO, or (3) the magistrate abused their discretion regarding specific terms of the CPO. Civ.R. 65.1(F)(3)(d)(iii); *Durastanti v. Durastanti*, 1st Dist. Hamilton No. C-190655, 2020-Ohio-4687, ¶ 15.

{¶ 32} On appeal, where, as here, the appellant challenges the trial court's decision to issue or deny a CPO (rather than challenging the scope or terms of the CPO), we review the decision under a manifest-weight-of-the-evidence standard. *Gruber v. Hart*, 6th Dist. Ottawa No. OT-06-011, 2007-Ohio-873, ¶ 17. We will not reverse the trial court's decision if it is supported by some competent, credible evidence going to all the essential elements of the case. *Edwards v. Reser*, 6th Dist. Ottawa No. OT-07-022, 2007-Ohio-6520, ¶ 25, citing *C.E. Morris Co. v. Foley Constr. Co.*, 54 Ohio St.2d 279, 376 N.E.2d 578 (1978), syllabus.

**A. The trial court did not "misinterpret" the menacing-by-stalking statute.**

{¶ 33} In his first assignment of error, S.Y. argues that the trial court erred in sustaining A.L.'s objections and vacating the CPO because the court "misinterpreted" the applicable definitions in the Revised Code, leading to an erroneous determination that

14.

"menacing by stalking was inapplicable to this case * * *." Specifically, S.Y. argues that A.L. engaged in a pattern of conduct, the changes he made to his life constituted "substantial incapacity" sufficient to support a finding of mental distress, and A.L.'s follow requests caused mental distress "due to the fact that he has been incarcerated for responding in the past."

{¶ 34} A.L. counters that S.Y. misconstrues the trial court's decision. She contends that, rather than incorrectly interpreting R.C. 2903.211, the trial court found that S.Y. failed to meet his burden of proof. She also argues that the trial court correctly made a distinction between "mental distress" under the menacing-by-stalking statute and the general stress S.Y. testified to feeling.

{¶ 35} To obtain a CPO based on menacing by stalking, the petitioner is required to show by a preponderance of the evidence that the respondent engaged in a pattern of conduct by which she knowingly (1) caused the petitioner mental distress, (2) caused the petitioner to believe that she would cause him physical harm, or (3) caused the petitioner to believe that she would cause him mental distress.[2] R.C. 2903.211(A)(1). In this case,

---

[2] We note that there is disagreement among Ohio's appellate districts regarding whether R.C. 2903.211(A)(1) is violated only by the wrongdoer causing *actual* mental distress or if the victim's *belief* that the wrongdoer will cause mental distress is sufficient. *See Fondessy v. Simon*, 142 Ohio St.3d 147, 2014-Ohio-4638, 28 N.E.3d 1202, ¶ 17-18 (Kennedy, J., dissenting) ("A conflict exists among the appellate districts regarding whether R.C. 2903.211(A)(1) requires that the victim actually experienced mental distress or whether the victim's belief that the stalker will cause him or her mental distress is sufficient."). In the Sixth District, we have determined that R.C.

15.

S.Y. did not allege that he was afraid of physical harm from A.L. or that he believed A.L. would cause him mental distress, so a CPO was appropriate only if S.Y. showed that A.L. caused him actual mental distress.

{¶ 36} "Mental distress" includes any "mental illness or condition" that either "involves some temporary substantial incapacity[,]" or "would normally require psychiatric treatment, psychological treatment, or other mental health services * * *." R.C. 2903.211(D)(2)(a)-(b).  In the context of menacing by stalking, "'[i]ncapacity is substantial if it has a significant impact upon the victim's daily life.'"  *Ellet v. Falk*, 6th Dist. Lucas No. L-09-1313, 2010-Ohio-6219, ¶ 38, quoting *State v. Horsley,* 10th Dist. Franklin No. 05AP-350, 2006-Ohio-1208, ¶ 48.  Substantial incapacity can be corroborated by a change in the petitioner's routine.  *Spaulding v. Spaulding*, 6th Dist. Lucas No. L-20-1102, 2021-Ohio-533, ¶ 13.  But, importantly, mental distress is something more than "'mere mental stress or annoyance[.]'"  *Fondessy v. Simon*, 6th Dist. Ottawa No. OT-11-041, 2013-Ohio-3465, ¶ 19, quoting *Caban v. Ransome,* 7th Dist. Mahoning No. 08 MA 36, 2009-Ohio-1034, ¶ 29.  Civil-protection-order statutes "were not enacted for the purpose of alleviating uncomfortable situations, but to prevent the type of persistent and threatening harassment that leaves victims in constant fear of

---

2903.211(A)(1) is violated by both a victim's actual mental distress and his belief that the wrongdoer will cause mental distress.  *E.g., Olson v. Olson*, 6th Dist. Wood No. WD-15-002, 2016-Ohio-149, ¶ 15.  Ultimately, the distinction is immaterial in this case because S.Y. does not argue that A.L.'s actions caused him to *believe* that she would cause him mental distress; he argues only that A.L.'s actions caused him *actual* mental distress.

physical danger [or mental distress]." *Kramer v. Kramer*, 3d Dist. Seneca No. 13-02-03, 2002-Ohio-4383, ¶ 17.

{¶ 37} In its decision, the trial court determined that S.Y. did not meet his burden of showing by a preponderance of the evidence that A.L. caused him mental distress. Although S.Y. contends that the court's decision was based on "misinterpret[ing]" the definitions in the CPO and menacing-by-stalking statutes, the court's decision was not based on a flawed understanding or application or the law. That is, the trial court did not misinterpret or misapply the law applicable to S.Y.'s case; it simply found that S.Y. did not meet his burden of proof. This determination is supported by the record.

{¶ 38} S.Y. argues that he showed the substantial incapacity required to prove mental distress because he "moved his residence, changed his phone number, and stopped using social media as a result of the contacts from [A.L.,]" all of which evidences a change of routine sufficient to show mental distress. The problem with this argument is that S.Y. did *not* testify that he made changes to his life because of A.L.'s attempts to contact him on social media. Instead, he said that he made those changes because of the consent protection order against him—i.e., he changed his behavior to avoid inadvertently violating the order—which does not show that *A.L.'s* actions caused him temporary, substantial incapacity.

{¶ 39} At the hearing, S.Y. reiterated several times that his concerns and stresses were rooted in the existence of the protection order against him, not necessarily in A.L.'s

behavior.  For example, when his attorney asked if he was "afraid for [his] health and safety[,]" S.Y. said that he was "because I have an order of protection on me * * *."  S.Y. went on to say that he could not use his phone "without worrying."  When his attorney asked why he would be "scared" of text messages, phone calls, and follow requests, S.Y. again said, "Because of the order of protection against me."  And S.Y. said that he deleted follow requests as he received them "[b]ecause it's been stressful, and I make sure I'm not putting myself at risk."  On cross, S.Y. specifically said that the existence of the consent protection order against him caused him distress.

{¶ 40} The only "mental distress" that S.Y. linked to A.L.'s social media requests was that he "stopped using social media."  But even that was, essentially, because S.Y. was "changing a lot of things in my life *to make sure I'm not violating the protection order accidentally*."  (Emphasis added.)  Those changes included moving to a new residence, not going to his parents' house, and not talking to old friends because "[i]t's just too risky * * *."  Although these actions are a change in S.Y.'s routine, they cannot be used to corroborate his mental distress because, again, S.Y. did *not* say that he made these changes *because of* A.L.'s social media contacts, which was the only allegation in his CPO petition that he pursued at the full hearing.  In other words, the conclusion we reach from S.Y.'s testimony is that he would have made these changes to his routine *regardless of whether A.L. contacted him through social media*.

18.

**{¶ 41}** The only other evidence of A.L.'s distressing actions that S.Y. presented was A.L. riding her bike past his parents' house two times in one day making "puking noises." Father did not testify that A.L.'s actions caused him or S.Y.'s mother mental distress or made either of them believe that A.L. would cause them mental distress. At best, this is evidence of A.L. causing annoyance, but it does not rise to the level of mental distress. *Fondessy*, 6th Dist. Ottawa No. OT-11-041, 2013-Ohio-3465, at ¶ 19, quoting *Caban,* 7th Dist. Mahoning No. 08 MA 36, 2009-Ohio-1034, at ¶ 29 (mental distress is something more than "'mere mental stress or annoyance'").

**{¶ 42}** In its decision, the trial court found that a preponderance of the evidence did not support a finding that S.Y. suffered mental distress because S.Y. "feeling uneasy or worried about having possible direct or indirect contact with [A.L.], and the potential ramifications therefrom, do not rise to the level of 'mental distress' clearly anticipated by the applicable statutes * * *." On balance, we find that the trial court's determination is supported by some competent, credible evidence and is not against the manifest weight of the evidence. Accordingly, S.Y.'s first assignment of error is not well-taken.

## B. The trial court followed Civ.R. 65.1(F)(3)(d)(iii) when it ruled on the objections.

**{¶ 43}** In his second assignment of error, S.Y. argues that the trial court improperly ruled on A.L.'s objections because it "decided that the law was not properly applied even though this was not argued [by A.L.,]" and it looked beyond the face of the magistrate's order to find an error of law. A.L. responds that the court's decision was

19.

based on its finding that the evidence was insufficient to support granting the CPO, and that Civ.R. 65.1 allows the court to look beyond the face of the order to determine whether the evidence was insufficient.

{¶ 44} S.Y.'s arguments under this assignment of error are based on a faulty reading of the trial court's decision. Although S.Y. claims that the court "sidestepped" the factual issues that A.L. raised in her objections by "decid[ing] that the law was not properly applied even though this was not argued[,]" that is not the case. Under Civ.R. 65.1(F)(3)(d)(iii), the trial court had to determine whether "the credible evidence of record is insufficient to support * * *" granting the CPO. The court did not make an explicit credibility determination about either S.Y.'s or A.L.'s testimony, but its conclusions are based on the assumption that A.L. engaged in the acts that S.Y. complained of at the hearing. The court determined that those actions are insufficient to meet the requirements of the applicable statutes. This is precisely what Civ.R. 65.1(F)(3)(d)(iii) requires.[3]

{¶ 45} Because the trial court did not err in its determination of A.L.'s objections, S.Y.'s second assignment of error is not well-taken.

---

[3] Contrary to S.Y.'s implication, the trial court is not precluded from considering the law beyond a review of the face of the magistrate's order. As a practical matter, it would be impossible for a trial court to determine if the credible evidence of record was insufficient to support the magistrate's decision without considering both the facts of the case and the applicable law.

20.

## C. The trial court's decision recognized the policy that S.Y. argues for.

{¶ 46} In his final assignment of error, S.Y. argues that the trial court failed to recognize that A.L. was abusing the purpose of the protection order she has against him, and as a matter of policy, we should hold that "when a pattern of conduct of harassment is present from a protected party to a party who cannot have contact with the protected party, that this satisfies the element of mental distress * * *."

{¶ 47} S.Y.'s policy argument is based on his incorrect assumption that the trial court "fail[ed] to recognize that the protected party abused the purpose of the protection order." However, the trial court took A.L.'s actions into account when it determined that there was insufficient evidence to support the magistrate granting a CPO to S.Y.—and it determined that A.L.'s actions, as S.Y. presented them, did not rise to the level of misbehavior required for a CPO under R.C. 2151.34. Therefore, S.Y.'s policy arguments are misplaced in the context of this case. We further decline to adopt a per-se rule that "mental distress" exists any time a protected party engages in conduct that seemingly "abuses" the protections afforded by a CPO.

{¶ 48} S.Y.'s third assignment of error is not well-taken.

21.

## III. Conclusion

**{¶ 49}** For the foregoing reasons, the October 3, 2022 judgment of the Wood County Court of Common Pleas, Juvenile Division, is affirmed. S.Y. is ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Thomas J. Osowik, J.

_____
JUDGE

Christine E. Mayle, J.

Gene A. Zmuda, J.
CONCUR.

_____
JUDGE

_____
JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.